No. 25-7510

_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

CALIFORNIANS FOR EQUAL RIGHTS FOUNDATION,

Plaintiff – Appellant,

v.

MISTY HER, superintendent of the Fresno Unified School District; and
VALERIE F. DAVIS, President of the Fresno Unified School District

Defendants – Appellees.

_____

On Appeal from the United States District Court
for the Eastern District of California
Case No. 1:25-cv-00250-BAM
The Honorable Barbara A. McAuliffe, United States Magistrate Judge

_____

## REPLY BRIEF

_____

Glenn E. Roper
Pacific Legal Foundation
1745 Shea Center Dr., Suite 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
GERoper@pacificlegal.org

Wilson C. Freeman
Pacific Legal Foundation
555 Capitol Mall, Ste. 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
WFreeman@pacificlegal.org

*Attorneys for Plaintiff – Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION ................................................................................. 1

ARGUMENT ....................................................................................... 3

   I.    CFER Has Standing................................................................ 3

        A.    Non-African-American Students Are Injured by Fresno's Discrimination ................................................................... 4

        B.    Fresno Gets Article III Injury Requirement Wrong ........... 8

          1.   There is no application requirement when a plaintiff is treated unequally on the basis of race ............................. 9

          2.   There is no competition requirement for victims of racial discrimination ................................................................. 12

          3.   Non-African-American students are "de facto" injured by their deliberate exclusion ............................................. 17

        C.    Injuries Can Be Widely Shared ........................................ 20

        D.    CFER's Injury Is Ongoing ................................................ 22

   II.   CFER's Claim Is Not Moot ...................................................... 24

   III. The District Court's Judicial Notice Error Requires Correction 25

CONCLUSION ................................................................................. 29

CERTIFICATE OF SERVICE............................................................... 31

CERTIFICATE OF COMPLIANCE FOR BRIEFS ................................. 32

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) ................................................................... 10

*Ala. Legis. Black Caucus v. Alabama,*
575 U.S. 254 (2015) ........................................................... *passim*

*Baker v. Carr,*
369 U.S. 186 (1962) ................................................................... 10

*City of Mesquite v. Aladdin's Castle, Inc.,*
455 U.S. 283 (1982) ................................................................... 25

*FBI v. Fikre,*
601 U.S. 234 (2024) ................................................................... 25

*Friery v. L.A. Unified Sch. Dist.,*
448 F.3d 1146 (9th Cir. 2006) ..................................................... 9

*Gratz v. Bollinger,*
539 U.S. 244 (2003) ................................................................... 12

*Harrison v. Kernan,*
971 F.3d 1069 (9th Cir. 2020) ................................................ 14–15, 21

*Heckler v. Mathews,*
465 U.S. 728 (1984) ................................................................... 19

*Hollingsworth v. Perry,*
570 U.S. 693 (2013) ................................................................... 20

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ..................................................................... 3

*Khoja v. Orexigen Therapeutics, Inc.,*
899 F.3d 988 (9th Cir. 2018) ................................................. 28–29

*Louisiana v. Callais,*
 No. 24-109, slip op. (U.S. Apr. 29, 2026) ................................ 15, 19–20

*Madsen v. Boise State University,*
 976 F.2d 1219 (9th Cir. 1992) ................................................. 9–10, 12

*Ne. Fla. Chapter of Associated Gen. Contractors v.*
 *City of Jacksonville,*
 508 U.S. 656 (1993) ....................................................................... *passim*

*Parents Involved in Cmty. Schs. v.*
 *Seattle Sch. Dist. No. 1,*
 551 U.S. 701 (2007) .............................................................................. 13, 21

*Regents of Univ. of Cal. v. Bakke,*
 438 U.S. 265 (1978) ........................................................................... 6

*Shaw v. Reno,*
 509 U.S. 630 (1993) ................................................................. 6, 15, 19

*Spokeo, Inc. v. Robins,*
 578 U.S. 330 (2016) ........................................................................ 17

*Strauder v. West Virginia,*
 100 U.S. 303 (1880) ........................................................................ 19

*Students for Fair Admissions, Inc. v. President and Fellows*
 *of Harvard Coll.,*
 600 U.S. 181 (2023) ...................................................................... 3, 7

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) .................................................................. 17–18

*Turner v. Fouche,*
 396 U.S. 346 (1970) .................................................................. 13–14

*United States v. Hays,*
 515 U.S. 737 (1995) .......................................................................... *passim*

*United States v. Ritchie,*
 342 F.3d 903 (9th Cir. 2003) ...................................................... 27

iii

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) .................................................................. 2, 15–17

## Other Authorities

Brief for Appellant, *Louisiana v. Callais*, No. 24-109, 2024
   WL 5245865 (U.S. Dec. 19, 2024) ........................................... 15

## INTRODUCTION

This case asks whether students in a public school have standing to challenge a racially discriminatory program operated by the school. As alleged in the complaint, Fresno Unified's A4 programs were designed with the plain intent to benefit exclusively African-American students based on their race. This intent plays out in several ways: the programs' marketing materials say they are for African Americans; teachers are directed by administrators to invite African-American students and not students of other races; and students of the "wrong" race are directed to other programs. Each of these allegations are well-pled and must be accepted as true.

However, Fresno Unified argues that unless students have applied and been rejected, they are not injured. To reach this conclusion, Fresno Unified's brief makes a kitchen sink of arguments, almost entirely based on mischaracterizing decades of Supreme Court precedent: they argue discrimination only matters if kids are competing for spots; that kids should have applied to programs that have no application requirement; that kids who are not targeted in promotion efforts are bizarrely unaffected; that widely shared injuries are "generalized grievances"; that

1

Appellant Californians for Equal Rights Foundation (CFER)'s ongoing injury is somehow speculative; and that the case is both moot and not ripe thanks to their unilateral attempts to moot and unripen the case through backdoor changes to the programs' advertising—after the lawsuit was filed. And on that last score, the brief conspicuously fails to deny that Fresno Unified altered the A4 website after this lawsuit was filed—a fact which infected and fatally undermined the district court's ruling.

The impact of Fresno Unified's position is that public schools can discriminate on the basis of race—as long as they do not write down a "formal" policy to exclude kids. This must be rejected. Under the Equal Protection Clause, all extracurricular programs in public schools must be available to all and must be promoted and operated as such. That promise would be empty if schools could evade the clause and create segregated programs through promotion and targeting programs. "Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand … the denial of equal justice is still within the prohibition of the constitution." *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886). The fact

that a school might be secretly willing to admit anyone who has the temerity to show up without being invited is irrelevant.

The Supreme Court in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College* (*SFFA*) stated that the "core purpose" of the Equal Protection Clause is to "do away with all governmentally imposed discrimination based on race." 600 U.S. 181, 206 (2023) (citation modified). The decision below threatens to close the courthouse doors and thwart this core purpose. It must be reversed.

## ARGUMENT

### I. CFER Has Standing

Because the other associational standing prongs are not contested,[1] the question is whether CFER's members—parents with non-African-American children in the Fresno Unified School District—would have standing to sue in their own right. *SFFA*, 600 U.S. at 199. Fresno Unified argues each prong of the standard Article III test: (1) the children were

---

[1] An organization has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

not injured by the A4 office and its programs, Resp. Br. at 23–51; (2) any harm is not traceable to wrongdoing by the school, *id.* at 51–52; and, (3) harm is not redressable. *Id.* at 52–54. But Fresno Unified's arguments rest on a series of legal errors: they mischaracterize the injury in equal protection cases as the denial of a benefit rather than the denial of equal treatment; they impose requirements—including a formal application, a competitive process, and a tangible harm—that appear nowhere in the case law; they mistake a widely shared injury for a generalized grievance; they treat an ongoing, present injury as speculative; and throughout they ignore the Complaint's well-pled allegations at a stage where those allegations must be accepted as true.

## A. Non-African-American Students Are Injured by Fresno's Discrimination

Non-African-American students in Fresno Unified schools are not bystanders or strangers to a discriminatory program at their school. Rather, the A4 Office and its programs systematically and intentionally exclude them. AOB at 5–7. The programs exclude them by stating explicitly, on their face, that the programs are for students of one race and not stating that they are open to all. *Id.* The A4 Office also excludes students by directing teachers to invite certain students and not others—

4

based on their race. *Id.* Fresno Unified also excludes students who are not African American from the programs and operates them with the intent to benefit only students of the "right" race.[2] The excluded students are deliberately left out and effectively told to stay away. It is no wonder they did not present themselves at the doors of the A4 programs.

As explained in CFER's Opening Brief, the students' injuries here are supported by decades of Supreme Court precedent. *See* AOB at 14–20. The Supreme Court in *Jacksonville* stated the rule: when government "erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," the "injury in fact" is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." 508 U.S. at

---

[2] Fresno Unified repeatedly asserts there are no "barriers to entry" alleged and no "policies" alleged. *See, e.g.*, Resp. Br. at 27–28, 43. These assertions are false. Each of the exclusionary aspects listed in this paragraph are alleged in the Complaint and are both barriers to entry and policies of the administration and the A4 Office. *See* AOB at 5–7 (describing Complaint). *See also Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (describing a barrier as something that "makes it more difficult for members of one group to obtain a benefit," not an absolute bar). Fresno Unified also asserts that CFER fails to allege its members are "ready and able" to participate in the programs—a claim squarely contradicted by the Complaint. *See* ER 131 ¶¶ 11–13 (describing members' children as eligible and interested in the programs).

666. This injury, by its nature, does not require the plaintiff to even plead the loss of a benefit, only the denial of equal "treatment."

The Supreme Court has never limited this principle—it applies to discriminatory decisions in education and voting, just as it applies to contracting. In *Jacksonville*, there was standing for a contractors' association to challenge a racial preference, although it had not alleged that any of its members would have won a contract but for the ordinance. *Id.* at 664–66. In *Bakke*, there was standing when a medical student challenged a racial preference because the university's policy did not allow him "to compete for all 100 places in the class." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978). In the gerrymandering context, the Supreme Court has recognized that there is standing for voters in racially gerrymandered districts; as the Court has explained, "[w]here a plaintiff … has been denied equal treatment because of the legislature's reliance on racial criteria, [the plaintiff] has standing to challenge the legislature's action." *United States v. Hays*, 515 U.S. 737, 744–45 (1995). *See also Shaw v. Reno*, 509 U.S. 630, 642–44 (1993) (standing to challenge racial redistricting).

6

Because the injury is the denial of equal treatment, the touchstone for pleading is an allegation of personal discrimination. For example, in the gerrymandering context, the Supreme Court has held that a plaintiff satisfies the threshold standing inquiry by pleading that he has been "personally subjected to a racial classification." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015) (citation modified). In *Hays*, relying on *Jacksonville*, the Court recognized the "special representational harms racial classifications can cause." *Hays*, 515 U.S. at 744–45. *See also SFFA*, 600 U.S. at 220 ("[I]t demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities.").

Here, the children of CFER's members are enrolled in Fresno Unified schools where the A4 programs operate. ER-131–34. They are the intended audience for the district's educational offerings, but they are treated differently when it comes to the A4 Office because they are not of the "right" racial makeup. Based on a "personal" racial classification,[3]

---

[3] Fresno Unified asserts, without support, that "there is no allegation that any of Plaintiff's members were actually and personally subjected to a race-based classification." Resp. Br. at 36. This claim is absurd. The challenged program is titled the "African American Academic

they were not reached out to (as African-American students are), they are told the programs are not for them, and they understand that they would not be welcome. CFER alleges that these students are *personally* being denied equal treatment through this race-based branding, outreach, and steering directed at them in their own schools. That is not an undifferentiated stigmatic harm from distant governmental action; it is direct, personal, unequal treatment within the very institution these children attend daily.[4]

## B. Fresno Gets Article III Injury Requirement Wrong

In response, Fresno Unified makes three main arguments. First, it argues that CFER's students did not "apply or seek admission" to the A4 programs and that this precludes standing. Resp. Br. at 28–30. Second,

---

Acceleration Program" and CFER alleges that Fresno seeks out students of the right race and promotes the programs with discriminatory intent. This is the very definition of personal subjection. If a voter residing in a racially gerrymandered district is "personally subjected to a racial classification" for standing purposes, *Ala. Legis. Black Caucus*, 575 U.S. at 263 (citation modified), then so is a student enrolled in a school that sorts its own programming by race.

[4] Fresno Unified incorrectly asserts that CFER's members' children were "not interested" in the programs. Resp. Br. at 21–22. This is contradicted by the plain allegations of the complaint, which state that CFER's members "would be interested" or "are interested" in the programs. ER 131–34.

it argues that *Jacksonville* and its progeny all rely on a "competitive or otherwise closed system." *Id.* at 28. Third, it argues that CFER has failed to plead a "de facto" injury. *Id.* None of these arguments have merit.

### 1. There is no application requirement when a plaintiff is treated unequally on the basis of race

Fresno Unified argues that CFER's members cannot be harmed because they did not allege that their children applied and were personally turned away from the programs. Fresno Unified seeks to analogize this case to the pre-*Jacksonville* decision in *Madsen v. Boise State University*, 976 F.2d 1219, 1220 (9th Cir. 1992), which concluded that, generally, "a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit." *See also Friery v. L.A. Unified Sch. Dist.*, 448 F.3d 1146, 1149 (9th Cir. 2006). There are three problems with that comparison. First, *Madsen* is not even an equal protection case and presents a categorically different inquiry. Second, CFER has alleged a different injury than the plaintiff in *Madsen*. Third, *Madsen* predates *Jacksonville* and *Hays* and a hard application requirement cannot be squared with those cases in the equal protection context.

First, *Madsen* involved very different facts and was not an equal protection case at all. Rather, it was a Rehabilitation Act challenge involving a disabled student who sued Boise State University over the school's failure to offer free handicap parking permits. 976 F.2d at 1220. The plaintiff had never applied for a permit, never sought a fee waiver, and never paid the fee. *Id.* The court found that without applying for that benefit, his dispute with the university was too "nebulous;" the court could not even determine whether Madsen was claiming entitlement to a free permit for any handicap space or merely to a few permit-free handicap spaces. *Id.* Requiring an application in that setting served to "sharpen the presentation of issues" and "establish the existence of a well-defined controversy." *Id.* (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), and *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

The plaintiff in *Madsen* claimed a tangible, if uncertain, injury: either a free permit to park in any handicap space or handicap spaces accessible with a special, no-fee permit. *Id.* at 1221. CFER's injury arises from the denial of equal treatment in how the district brands, promotes, and administers publicly funded programs. Students in the district are subject to this ongoing injury when the administration excludes them

10

from steering and marketing of ongoing programs. This injury is, in part, intangible, and it exists regardless of whether any child would ultimately have obtained the benefits of a specific program. And the injury exists regardless of whether the child would have, in fact, been excluded—it accrues at the moment the child is treated differently because of his or her race. Indeed, this is the very distinction *Jacksonville* drew: the relevant injury for purposes of the Equal Protection Clause is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." 508 U.S. at 666.

There is not even an application process here that CFER's members could have entered. Students do not "apply" to A4 programs the way Madsen could have applied for a parking permit. Students are invited, steered, and promoted to, or not, based on race. ER-133–34. To the extent it is still good law post-*Jacksonville*, an application "requirement" cannot be required when applicants are told they cannot apply. A "Whites Only" sign isn't illegal only after a black customer tries to enter; it's illegal the moment it is erected. Similarly, here, nonblack students are told they are not welcome; they cannot be faulted for taking Fresno at its word. This dispute needs no sharpening; either non-African-American children are

11

discriminated against, or they are not—the alleged discrimination happens without any application process at all.

Finally, *Madsen* predates the Supreme Court's clarifications of equal protection standing. *Madsen* was decided in 1992, one year before *Jacksonville* reframed the injury inquiry in equal protection cases. The Supreme Court's subsequent decisions in *Hays*, 515 U.S. at 744–45, and *Alabama Legislative Black Caucus*, 575 U.S. at 263, confirm that the cognizable injury in equal protection cases is personal subjection to a racial classification, not the denial of a discrete benefit. To the extent *Madsen* suggests that an "application" is always required, it cannot be reconciled with the Supreme Court's intervening authority. *See also Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (plaintiff had standing based on intent to apply as transfer student, even though he had not actually applied).

### 2. There is no competition requirement for victims of racial discrimination

CFER alleges that the A4 Office put non-African-American students at a disadvantage by promoting programs as not open to all, and by not targeting or steering them to programs because of their race. ER-133–34. It does not allege that the A4 Office operates programs with

competitive admissions. Rather, the barrier here is that the administration deliberately steered unwelcome students away or never invited them at all. Because this steering and promotion was done on the basis of race, it inflicted an equal protection injury.

Fresno Unified argues that the only cognizable injury under *Jacksonville* is disadvantage in a competitive process. *See, e.g.*, Resp. Br. at 38–39. This argument suffers from two key flaws.

First, and most fundamentally, no case has ever held that equal protection standing requires a competitive process. The word "compete" appears in some of the standing cases; *Jacksonville* refers to the "inability to compete on an equal footing," 508 U.S. at 666, and *Parents Involved in Community Schools v. Seattle School District No. 1* describes students "forced to compete in a race-based system," 551 U.S. 701, 719 (2007). But neither case conditions standing on the presence of competition. The word is used descriptively, not as a doctrinal limitation. Instead, the rule in *Jacksonville* is stated in general terms: "the denial of equal treatment resulting from the imposition of [a] barrier" is an equal protection injury. 508 U.S. at 666. Nothing in that formulation requires scarcity, a limited number of slots, or a competitive selection process. *See also Turner v.*

13

*Fouche*, 396 U.S. 346, 362 (1970) ("Appellants and the members of their class do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications.").

Fresno Unified fails at its attempt to manufacture a competition requirement that no court has ever found. It is simply false that all cases recognizing equal protection standing involved "competitive or otherwise closed system[s]." Resp. Br. at 28. In *Harrison v. Kernan*, this Court held that a prisoner had standing to challenge a sex-based policy governing access to vendor catalog purchases, which involved neither competition nor scarcity. 971 F.3d 1069, 1074–75 (9th Cir. 2020). The supply of items was not limited, and the prisoner was not competing with anyone for access. The injury was simply that a governmental rule treated him differently on the basis of a protected characteristic.[5] *Id.*

---

[5] Fresno Unified attempts to distinguish *Harrison* on three specious grounds. First, it emphasizes that Harrison was a prisoner in a "custodial" setting, which "necessarily limits the potential group [of plaintiffs]." Resp. Br. at 41. But no case has ever held that the standing in equal protection depends on limiting the size of the affected group. In any event, CFER's members' children are enrolled in a public school system—although the group of affected students is larger than a prison population, it is similarly bounded. Next, Fresno Unified emphasizes that

The racial gerrymandering cases are also fatal to Fresno Unified's theory.[6] In *Hays*, *Shaw*, and *Alabama Legislative Black Caucus*, the Supreme Court held that voters in racially gerrymandered districts had standing to challenge the gerrymander because they were "personally subjected to a racial classification." *Ala. Legis. Black Caucus*, 575 U.S. at 263 (citation modified); *Hays*, 515 U.S. at 744–45; *Shaw v. Reno*, 509 U.S. 630, 642–44 (1993). There is no "competition" in these cases in any sense

---

*Harrison* involved a "formal regulation"; but such a rule would gut the Clause's protections. *Id.* at 42. *See Yick Wo*, 118 U.S. at 373–74. Third, Fresno Unified highlights that Harrison took some "affirmative steps." Resp. Br. at 42. But here, the district operates through race-based branding, steering, and selective invitations that keep nonblack students from being on equal footing. There is no grievance to file and no application to submit; the A4 programs tell CFER's members' children, by their design and promotion, that they are not welcome. *See also supra* Part I.A.1.

[6] Fresno Unified suggests that the racial gerrymandering standing cases are vulnerable, and the issue has indeed been pressed in the Supreme Court, including in *Louisiana v. Callais*. Resp. Br. at 32 n.2. In that case, the state expressly urged the Court to "disavow" *Hays* as "inconsistent with this Court's modern cases." Brief for Appellant at 27–31, *Louisiana v. Callais*, No. 24–109, 2024 WL 5245865 (U.S. Dec. 19, 2024). Indeed, Louisiana made many of the same arguments Fresno Unified advances here, including that gerrymandering plaintiffs are "not in competition at all, and thus there is no unequal footing on a playing field." *Id.* at 26. The Supreme Court, after full briefing, supplemental briefing, and reargument, declined to even address this argument, implicitly reaffirming *Hays*. *See Louisiana v. Callais*, No. 24–109, slip op. (U.S. Apr. 29, 2026).

15

relevant to equal protection standing. Fresno Unified's attempt to characterize gerrymandering cases as involving "an inherently competitive process" because they "involve[] the right to vote for candidates" (Resp. Br. at 33–34) is laughable. The equal protection injury in such cases stems not from a competitive process, but from the government's use of race to draw district lines, classifying voters based on race and inflicting upon them the "special representational harms racial classifications can cause." *Hays*, 515 U.S. at 744–45.

Fresno Unified's invented competition requirement would produce untenable results. Consider a public park ostensibly open to all residents but posts signs and enforces a policy allowing members of one race to use certain facilities while directing others elsewhere. Because park access is not distributed through a competitive process, Fresno Unified's rule would deny standing to those excluded. That result is inconsistent with the basic purpose of the Equal Protection Clause. It would mean that governmental entities could insulate race-based programs from judicial review simply by declining to create a competitive application process. The Equal Protection Clause does not permit such gamesmanship. *See*

16

*Yick Wo*, 118 U.S. at 373–74 (equal protection reaches discriminatory administration, not merely discriminatory enactments).[7]

### 3. Non-African-American students are "de facto" injured by their deliberate exclusion

Fresno Unified invokes *Spokeo*'s requirement that an injury be "*de facto*"—meaning it must "actually exist"—to argue that CFER's members have not suffered a concrete injury. Resp. Br. at 24 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). This argument fundamentally misunderstands the concreteness requirement and conflates it with tangibility. But the Court has been clear that a concrete injury can be intangible.

In *TransUnion LLC v. Ramirez,* 594 U.S. 413 (2021), the Supreme Court clarified what *Spokeo*'s concreteness requirement means in practice. The Court offered an instructive hypothetical: suppose a factory in Maine violates a federal environmental law by polluting land in Maine. *Id.* at 427. A Maine citizen whose property is damaged has a concrete

---

[7] Fresno Unified repeatedly refers to the lack of a "formalized and legislative barrier" to equal participation. *See, e.g.*, Resp. Br. at 50. The fact that Fresno Unified does not advertise and did not formalize the discriminatory elements of its policy, such as the steering of children on the basis of race, is legally irrelevant.

17

injury. But a plaintiff in Hawaii who sues over the same violation, which did not harm her, does not, even though the government was violating the law. *Id.* The Hawaii plaintiff lacks standing because the defendant's conduct did not concretely affect her; her only complaint is an abstract concern about the government's compliance with the statute. *Id.* Critically, the distinction in this hypothetical is not between tangible and intangible harms—the Court emphasized that "various intangible harms" qualify as concrete injuries. *Id.* at 425. Rather, the distinction is between plaintiffs who are personally affected by the challenged conduct and those who are not.

CFER's members are like the Maine citizen, not the Hawaii plaintiff. Their children attend Fresno Unified schools. ER 131–34. They are the intended audience for the district's educational programs. And they allege that the A4 Office's race-based branding, outreach, and steering operates on *them*, by classifying them by race and denying them equal promotion, steering, information, and invitations. *Id.* That is a concrete, *de facto* injury. That injury includes being classified and disadvantaged on the basis of race: the Supreme Court has held for over a century that governmental racial classifications inflict cognizable

18

injury, even if that injury is intangible. *See Strauder v. West Virginia*, 100 U.S. 303, 308 (1880). And the Court has specifically held that "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior,'" constitutes a "serious noneconomic injur[y]." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (concluding that plaintiff has standing even if federal court cannot award any monetary relief because Constitution guarantees "right to equal treatment").

The racial gerrymandering cases confirm the point beyond any doubt. In *Shaw*, *Hays*, and *Alabama Legislative Black Caucus*, the Supreme Court recognized concrete standing injuries based on nothing more than being placed in a racially drawn district. There is no tangible benefit lost in a gerrymandering case: no money, no program slot, no job, not even the ability to vote. The injury is that the government used race to structure a public system, and the plaintiff was personally subjected to that classification. *Hays*, 515 U.S. at 744–45; *Ala. Legis. Black Caucus*, 575 U.S. at 263. *See also Callais*, No. 24-109, slip op. at 18 (reaffirming that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are

19

founded upon the doctrine of equality"). Being sorted out of an educational program by race likewise is a *de facto* injury.

## C. Injuries Can Be Widely Shared

Throughout its brief, Fresno Unified wrongly refers to CFER's members' injury as "generalized." *See, e.g.*, Resp. Br. at 1–2, 8, 11, 21, 23, 28, 31, 35, 39, 44, 53–54, 56. The district court made the same mistake. *See* AOB at 20–23. Fresno Unified's claim that this case involves a generalized grievance focuses on the fact that the complaint addresses an illegal practice that broadly affects every non-African-American student in the district who might be interested in the A4 programs in effectively the same way. It also focuses on CFER's citation to the website that can be viewed by any member of the public. According to Fresno Unified, this case is simply an attempt to vindicate "value interests" and CFER's members are suffering "in common with people generally." Resp. Br. at 26–27 (citing *Hollingsworth v. Perry*, 570 U.S. 693, 705–07 (2013)).

There are two fundamental problems with this argument. First, CFER's members are *not* simply members of the general public. CFER is attempting to vindicate the rights of current public-school students who are subject to discrimination in the A4 programs. Fresno Unified claims

20

that standing is not afforded to "those uninvolved in the … closed system." Resp. Br. at 38–39. But even accepting that formulation, these students are not uninvolved in the closed system of the school district and its programs—they are embedded within it. The gerrymandering and contracting cases both vindicate this principle; an equal protection injury is often widely shared, and even widely shared discrimination creates an equal protection injury. *See, e.g.*, *Ne. Fla. Chapter*, 508 U.S. at 666; *Ala. Legis. Black Caucus*, 575 U.S. at 263; *Parents Involved*, 551 U.S. at 719; *Harrison*, 971 F.3d at 1074–75.

Second, CFER is not suing over mere words on the internet. This case involves allegations of actual, on-the-ground discrimination against students on the basis of race. The complaint is couched in terms not just of the A4 Office website, but of promotion and design of the A4 programs writ large, ER-133 ¶¶ 23–26, which are alleged to be structured to exclude non-African-American students. The complaint alleges that teachers—at administrators' direction—invite African-American students to participate but do not encourage or inform similarly situated non-African-American students, and that non-African-American students who learn about A4 programs are directed to other offerings

21

because of race. ER-133 ¶¶ 24–25. This discrimination concretely and specifically affects students who are excluded.

Ultimately, CFER's members are entitled to have their children's public school district design and promote programs to all students and to not have their children excluded and discriminated against based on race. These children are not bystanders; they are victims.

### D. CFER's Injury Is Ongoing

Fresno Unified next argues that CFER's injury is not "imminent." Resp. Br. at 45–51. As Fresno Unified asserts, "[a]t most, the Complaint alleges a speculative future harm concerning access to a program." *Id.* at 45.

This misstates the nature of CFER's alleged injury. Fresno Unified's discussion of *Jacksonville* reveals the fundamental confusion at the heart of its standing argument. Fresno Unified analogizes this case to a hypothetical lawsuit filed when Jacksonville's minority set-aside ordinance was "enacted, prior to (and without regard) to any actual competitive contracting process." Resp. Br. at 47. Fresno Unified then asserts that CFER's members are like contractors complaining about a

set-aside program before any contracts have been put out to bid and that their injury is speculative because nothing has happened to them yet.

But that analogy bears no resemblance to the complaint in this case. CFER does not challenge a program that might one day be administered in a discriminatory manner. It alleges that the A4 Office *is right now* operating programs in a discriminatory way: branding them as being for one race, promoting them through race-based teacher invitations, and administering them through race-based steering. ER-133 ¶¶ 23–26. CFER's members' children are enrolled in schools where these programs operate *right now*. ER-131 ¶¶ 11–13. They are denied equal outreach and equal information *right now*. *Id.* The proper analogy is not to a contractor complaining before bidding has begun, but to a contractor who is actively bidding on city contracts while a set-aside ordinance allocates a percentage of every contract to other contractors on the basis of race.

Their injury is not speculative or future. It is present and ongoing.[8]

---

[8] For fundamentally the same reasons, the dispute is ripe. *See* AOB at 23–25.

## II.   CFER's Claim Is Not Moot

Fresno Unified argues in the alternative that this case is moot because the A4 Office has supposedly been renamed and its website updated to alter some of the offending language. Resp. Br. at 64–66. This argument fails for two independent reasons.

First, Fresno Unified points to a supposed name change and updated website language, but has never represented, let alone demonstrated, that it has stopped race-based steering, selective outreach, and the other discriminatory aspects of the program design alleged in the complaint. This case is about discrimination in many forms, not just language on a website. The district still operates the same office, administers the same programs, and continues to direct teachers to recruit students on the basis of race.

Indeed, the fact that Fresno Unified claims that it has renamed the office from "African American Academic Acceleration" to "Advancing Academic Acceleration & Achievement"—while continuing to operate the same programs—is, if anything, further evidence that the district is not abandoning its discriminatory practices but rebranding in an attempt to insulate them from judicial review. At minimum, whether the district has

24

genuinely ceased the challenged conduct is a factual question that cannot be resolved without discovery; certainly not based on a defendant-controlled website that has already been altered at least twice since this lawsuit was filed.

Second, even if there were evidence of a change, voluntary cessation of challenged conduct does not moot a case unless the defendant satisfies specific and demanding criteria. *See* AOB at 36 n.4. Fresno Unified has not even attempted to carry that burden. A cosmetic rebrand is not the kind of permanent, irrevocable change that satisfies the heavy burden required to establish mootness. *See FBI v. Fikre*, 601 U.S. 234, 240–42 (2024) (reiterating the "formidable" nature of the voluntary-cessation standard); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) ("A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.").

## III. The District Court's Judicial Notice Error Requires Correction

CFER's Opening Brief and Motion for Reconsideration explained at length why the district court's judicial notice ruling was erroneous. *See*

25

AOB at 31–38; ER-039–53. Fresno Unified's response fails to meaningfully defend the ruling's multiple flaws.

As an initial matter, its response is remarkable for what it does *not* say. At no point in its 73-page brief does Fresno Unified ever deny that it altered the A4 website after this lawsuit was filed.[9] The reason is obvious—it cannot truthfully make that denial. When CFER was preparing its complaint, the website unambiguously stated that the A4 Office "serves African American and black pre-K through 12th grade students." ER-042. It contained no participation statistics and no suggestion the programs were open to students of other races. After the complaint was filed, Fresno Unified revised the page to add statistics and claim that the programs had "served 7,950 students of all racial and ethnic backgrounds." ER-043. Fresno Unified does not dispute that it made these changes—an omission that speaks volumes.

Instead, Fresno Unified seeks to flip the field, claiming that *CFER* is somehow at fault for the website inconsistencies and that it must have "neglected to check the A4 website before it filed its Complaint." Resp.

---

[9] Fresno Unified's mootness argument acknowledges that the website is a living document that has changed since the lawsuit was filed.

Br. at 60–61. To the contrary, CFER's counsel referenced the website in preparing the complaint.[10] And Fresno Unified cites no support for the argument that it is proper to take judicial notice of an allegedly altered website unless the plaintiff can provide the court with day-of-complaint screenshots. That argument is specious, especially where the defendant itself controls the website's content.[11]

On the substance, the district court erred in concluding that CFER incorporate the A4 website into the complaint in the first place. Fresno Unified assumes that citing a website is equivalent to incorporating it, but the incorporation-by-reference doctrine requires more than passing citation. A document is incorporated by reference when the complaint "refers extensively to the document" or when "the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). CFER's complaint cited the A4 website in two paragraphs

---

[10] Fresno Unified's argument is internally contradictory: it contends both that CFER "incorporated" the website by citing it in the complaint, Resp. Br. at 57–58, and that CFER neglected to look at the website. *Id.* at 60–61. Both cannot be true—and in this case, neither is.

[11] At the very least, the precise timing and content of the website changes are a proper subject of discovery. As the party arguing for judicial notice, Fresno Unified bears the burden of establishing that there were *not* changes to the website.

for a limited purpose: to quote the program's own description of itself and to identify specific programs the A4 Office operates. ER-132–33 ¶¶ 20, 22. The website is not the "basis" of CFER's claims: the basis of CFER's claims is the district's race-based administration of the A4 programs through branding, targeted outreach, and steering. ER-133 ¶¶ 23–26. CFER's allegations are neither limited to nor depend on the A4 website. And citing defendant's words from a website is not the same as attaching a document to the complaint and staking one's claims on its contents. If it were, any plaintiff who cited website statements could be deemed to have incorporated everything else on the same webpage, including material added after the lawsuit was filed. That is not the law.

Even if the A4 website had been incorporated into the complaint, and even if Fresno Unified had not changed the website after the complaint was filed, accepting assertions on the website for their truth was error. In *Khoja v. Orexigen Therapeutics, Inc.*, this Court held that "just because [a] document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." 899 F.3d 988, 999 (9th Cir. 2018). More directly still: "it is improper to assume the truth of an incorporated document if

28

such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003. The district court erred in adopting statements on the A4 website for their truth.

Finally, Fresno Unified insists that the district court's standing analysis was "independent of the website content." Resp. Br. at 62–63. The district court said essentially the same thing in denying CFER's motion for rehearing. ER-011. But the orders themselves tell a different story—they repeatedly discuss the website statistics, including to support the inference (not found in the complaint) that nonblack students participate in the A4 programs. ER-072; ER-083. If the statistics truly played no role in the analysis, Fresno Unified should have no objection to this Court vacating the judicial notice ruling. Indeed, if this case is going to proceed, that ruling must be vacated, so that these disputed, post-filing assertions do not continue to infect the proceedings on remand.

## CONCLUSION

The district court's Rule 12(b)(1) dismissal should be reversed and its judicial notice ruling vacated.

DATE: April 29, 2026.                    Respectfully submitted,


                                          s/  Wilson C. Freeman
                                         Wilson C. Freeman
                                         Pacific Legal Foundation
                                         555 Capitol Mall, Ste. 1290
                                         Sacramento, California 95814
                                         Telephone: (916) 419-7111
                                         Facsimile: (916) 419-7747
                                         WFreeman@pacificlegal.org

                                         Glenn E. Roper
                                         Pacific Legal Foundation
                                         1745 Shea Center Dr., Suite 400
                                         Highlands Ranch, CO 80129
                                         Telephone: (916) 419-7111
                                         Facsimile: (916) 419-7747
                                         GERoper@pacificlegal.org

                                         *Attorneys for Plaintiff – Appellant*

30

# CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 s/  Wilson C. Freeman       
Wilson C. Freeman

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

9th Cir. Case Number: 25-7510

I am the attorney or self-represented party.

**This brief contains 6,137 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (select only one):

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

DATE:  April 29, 2026.          s/  Wilson C. Freeman
                                Wilson C. Freeman
                                *Attorney for Plaintiff – Appellant*

32